IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs March 14, 2017

**MAURICE O. BYRD, JR. v. STATE OF TENNESSEE**

**Appeal from the Circuit Court for Montgomery County**
**No. 40600534      William R. Goodman, III, Judge**

———————————————

**No. M2016-01061-CCA-R3-PC**

———————————————

A Montgomery County jury convicted the Petitioner, Maurice O. Byrd, Jr., of aggravated robbery, first degree felony murder, and premeditated first degree murder, and the Petitioner received an effective sentence of life. On appeal, this court affirmed the judgments. *See State v. Maurice O. Byrd*, No. M2010-02405-CCA-R3-CD, 2012 WL 5989817, at *1 (Tenn. Crim. App., at Nashville, Nov. 29, 2012), *perm. app. denied* (Tenn. Dec. 11, 2013). The Petitioner filed a post-conviction petition, and the post-conviction court denied relief following a hearing. On appeal, the Petitioner maintains that he received the ineffective assistance of appellate counsel. After review, we affirm the post-conviction court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which NORMA MCGEE OGLE and CAMILLE R. MCMULLEN, JJ., joined.

Gregory D. Smith, Clarksville, Tennessee, for the appellant, Maurice O. Byrd, Jr.

Herbert H. Slatery III, Attorney General and Reporter; Clark B. Thornton, Senior Counsel; John W. Carney, Jr., District Attorney General; and Helen O. Young, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**
**I. Facts**

A Montgomery County jury convicted the Petitioner of first degree murder and aggravated robbery. The facts at trial showed that the Petitioner robbed the victim of cocaine and cash with the use of a .380 caliber Hi-Point handgun. During the course of the robbery, the Petitioner shot the victim in the head, resulting in the victim's death. *See*

*State v. Maurice O. Byrd*, No. M2010-02405-CCA-R3-CD, 2012 WL 5989817, at *1 (Tenn. Crim. App. Nov. 29, 2012), *perm. app. denied* (Tenn. Dec. 11, 2013). On appeal, this court affirmed the trial court's judgments. *Id.*

The Petitioner was represented by appointed counsel ("Counsel") at trial. On appeal, the Petitioner retained appellate counsel ("Appellate Counsel"). For reasons discussed more fully below, no Tennessee Rule of Appellate Procedure 11 petition was filed on the Petitioner's behalf. In July 2013, the Petitioner timely filed a post-conviction petition, and the Petitioner's post-conviction counsel filed a delayed Tennessee Rule of Appellate Procedure 11 petition. In his petition, the Petitioner claimed that Appellate Counsel had not timely notified him of the Court of Criminal Appeals' decision affirming the judgments, and thus no Rule 11 application for permission to appeal had been filed. The lower court granted the Petitioner's request for a delayed appeal and reserved all other post-conviction issues. The Tennessee Supreme Court denied the delayed Rule 11 application on December 11, 2013.

On January 14, 2014, the Petitioner filed an amended post-conviction petition alleging ineffective assistance of trial counsel, a conflict of interest with respect to Appellate Counsel, and ineffective assistance of Appellate Counsel. On July 17, 2014, the judge who presided over the Petitioner's trial held a hearing on the Petitioner's issue of ineffective appellate counsel. The Petitioner asserted that Appellate Counsel raised only one issue on appeal and that it was based solely on a case that had been overruled by our supreme court. The Petitioner argued that Appellate Counsel's failure to discover that *State v. Crawford*, 470 S.W. 2d 610 (Tenn. 1971), had been overruled by *State v. Dorantes* , 331 S.W.3d 370 (Tenn. 2011), created a structural defect and prejudice is presumed in cases with a structural defect pursuant to *Momon v. State*, 18 S.W.3d 152 (Tenn. 1999). After hearing the proof, the post-conviction court denied relief as to the Petitioner's claim of ineffective assistance of appellate counsel.

On March 30, 2015, and February 20, 2016, a the post-conviction[1] held hearings on the Petitioner's claim of ineffective assistance of trial counsel. After hearing the proof, the post-conviction court denied relief, finding that the Petitioner had not established his claims of ineffective assistance of trial and appellate counsel. The post-conviction court also denied the Petitioner's claim of "presumptive prejudice" due to an alleged "structural defect" in the trial process.

On appeal, the Petitioner asserts that the post-conviction court erred "by failing to grant a full-blown delayed appeal on ineffective assistance of counsel." He argues that there is a structural error in violation of *Momon v. State*.

---

[1] After the hearing on the Petitioner's claim of ineffective assistance of counsel, the post-conviction court judge retired. The second set of hearings were held by the newly appointed judge.

## A. Trial Facts

On direct appeal, this court summarized the evidence presented at trial as follows:

On July 1, 2005, Frank Dowlen, Jr. went to the victim, Eric Payton's, apartment in Clarksville, Tennessee. At trial, Mr. Dowlen testified that he and the victim were "pretty good friends." According to Mr. Dowlen, he was going to the victim's apartment that day to pay the victim twenty dollars that he owed the victim and to buy some marijuana from the victim. Mr. Dowlen testified that his older brother, Alpha Omega Dowlen, drove him to the victim's apartment. Mr. Dowlen estimated that he got to the victim's apartment sometime between 10:30 and 11:00 a.m. that morning. Mr. Dowlen testified that he would usually enter the apartment from the back door, but on that morning he went to the front door to "just run in, run out real quick." Mr. Dowlen was "surprised" to find the front door "cracked open." Mr. Dowlen testified that he "stuck [his] head in" and called out the victim's name. Mr. Dowlen saw the victim in the living room "laid up under a blanket."

Mr. Dowlen testified that the blanket covered the victim's whole body, including the victim's head. Mr. Dowlen approached the victim, pulled up the blanket, and saw that the victim's "brain was blown out and his eyeball was sitting next to his face." Mr. Dowlen recalled that there was "a puddle of blood" underneath the victim as well as blood on the victim's face. Mr. Dowlen testified that the blood on the victim's face and in the "puddle" was already dry and not "wet." After finding the victim's body, Mr. Dowlen "just ran" out of the apartment and back to his brother's vehicle. Mr. Dowlen "went over to [a] friend's house and called the police . . . and told them there was a dead body" at the victim's apartment. Mr. Dowlen testified that he did not see a gun or anyone else at the apartment that morning. Mr. Dowlen denied having a gun with him that day and denied that he shot the victim.

. . . .

Sergeant Marty Watson of the Clarksville Police Department (CPD) was one of the first officers to arrive at the victim's apartment on July 1, 2005. Sgt. Watson testified at trial that he was dispatched to the victim's apartment around 11:56 a.m. and that he arrived at the apartment complex at 12:02 p.m. Sgt. Watson testified that when he arrived at the apartment

3

complex, he was unsure which apartment to go to. Sgt. Watson "talked to some people there" and then "the landlord showed up and he advised . . . [that] the guy left his back door open." Sgt. Watson and some other officers went to the back of the victim's apartment and entered through a patio door that "was open about a couple of inches." Sgt. Watson testified that the victim "was laying [sic] . . . ten or twelve feet inside from the back door . . . face down." The victim was "partially covered up with a blanket," there was "a towel laying [sic] under his face area," and a "pillow case" in front of him.

Sgt. Watson testified that upon seeing the victim's injuries, he knew that the victim was deceased. According to Sgt. Watson, the victim's "right eye was messed up and there was a wound to the back of his head also." Sgt. Watson observed that the blood on the floor and on the victim's face had "started to dry." Sgt. Watson found "a shell casing to the right" of the victim and a slug "underneath" the victim's arm. Sgt. Watson testified that there was no one in the apartment when the police arrived and that no weapons were recovered after a search of the apartment. Sergeant Timothy W. Saunders of the CPD testified that he collected the following evidence from the victim's apartment: one .380 caliber bullet, one shell casing, and one slug. Sgt. Saunders testified that the bullet was found "in a kitchen drawer" with no weapon or other ammunition with it. According to Sgt. Saunders, the shell casing was found "on the floor behind the victim, next to the table," and the slug was found "under the victim's right arm." Sgt. Saunders also testified that there were no firearms found in the victim's apartment.

Detective Brad Crowe of the CPD testified that he assisted with evidence collection at the victim's apartment on July 1, 2005. Det. Crowe recovered nine Lortab pills packaged in "small baggies that were tied up" from the door of the "freezer portion of the [victim's] refrigerator." Det. Crowe also recovered a "white plastic grocery sack" containing "some marijuana" from the freezer. Det. Crowe testified that he recovered twenty-four dollars from one of the kitchen cabinets. The money "appeared to have come out of a broken . . . canister that you would have flour or something in." The canister "looked like it had been broken and the money was laying right there with it." Det. Crowe also testified that no cocaine or weapons were recovered from the victim's apartment.

The police investigation into the victim's murder revealed that the night before, on June 30, 2005, the victim had a "going away" party at his

apartment for his friend Arthur Lee Anderson, Jr. The party continued into the early morning hours of July 1, 2005, and several people were in and out of the victim's apartment that night. In addition to the victim and Mr. Anderson, the following people were at the victim's apartment that night: the victim's "best friend," Thomas Lloyd Cantrell; Christian Hope Morris Hutchins, who had gone to school with the victim; two of the victim's cousins, Mareo Santez Kizer and Kedrick Phillips; one of the victim's neighbors, Anthony Townsend; and the [Petitioner]. Mr. Kizer testified that everyone at the victim's apartment that night was "[j]ust drinking and smoking a little weed, just trying to have a little party." At trial, all of the witnesses who had been to the party testified that they were intoxicated from various drugs that night. Ms. Hutchins testified that every time she visited the victim's apartment "there was something going on . . . [j]ust drugs and drinking, [and] people coming in and out."

At the time of his death, the victim was unemployed, supported himself by "selling drugs," and paid all of his bills with cash. The victim's sister, Jennifer Payton Adams, testified that the victim "lived completely on cash." Mr. Cantrell testified that during the morning of June 30, 2005, he went with the victim to purchase the following drugs: a "quarter pound" of marijuana packaged in "one of them little hand grocery bags," a "baggie of Lortab" pills, a "couple" of ecstasy pills, and "a ball, a ball and a half of cocaine." Mr. Cantrell explained that he was referring to an "eightball" of cocaine and that an eightball contained 3.5 grams of cocaine. Mr. Cantrell estimated that the victim bought between seven and eight grams of cocaine that day. Mr. Cantrell testified that after the victim purchased the drugs he had approximately $500 in cash left over. According to Mr. Cantrell, the victim took the drugs and cash back to his apartment.

Mr. Phillips testified that the victim "normally kept" his money in "a cookie jar in [a] cabinet in the kitchen." According to Mr. Phillips, he opened the cookie jar on the night of the party to put sixty dollars in it. Mr. Phillips testified that the jar was full of money, mostly twenty dollar bills. Mr. Phillips estimated that there was $1,000 in the cookie jar that night. Mr. Phillips also testified that the victim had told him that he was having a party because "he made" $1,000 that day. However, Mr. Phillips admitted that he did not take the money out of the cookie jar to count it and could only estimate how much was inside. Mr. Phillips also testified that, during the party, he saw "around a quarter pound" of marijuana in the victim's freezer. Ms. Hutchins testified that she saw marijuana, ecstasy, and cocaine

5

at the victim's apartment that night. However, Mr. Kizer denied that anyone at the party used cocaine that night.

Mr. Cantrell testified that he went to the victim's apartment around 3:00 a.m. on July 1, 2005, and there were several people at the victim's apartment. Mr. Cantrell stated that he went to the victim's apartment that morning to get some marijuana, but when he got there, the victim was passed out "lying in front of the TV, diagonal with his head like facing towards the coffee table, sleeping." Because the victim was asleep, Mr. Cantrell only stayed at the apartment for approximately ten minutes. Mr. Kizer testified that the victim was sick and throwing up "from alcohol," so they put a blanket on him and had him lie down in front of a fan. Ms. Hutchins, Mr. Kizer, and Mr. Phillips all testified that they left the victim's apartment together "early in the morning." The victim was still asleep on the living room floor when they left. They offered to give the [Petitioner] "a ride to where he wanted to go," but the [Petitioner] declined and said that "he wanted to stay to make sure that [the victim] was all right." The [Petitioner] and the victim were the only people left at the apartment when Ms. Hutchins, Mr. Kizer, and Mr. Phillips left that morning.

Ms. Hutchins estimated that she, Mr. Kizer, and Mr. Phillips left sometime between 6:00 and 7:00 a.m. on July 1, 2005. Ms. Hutchins testified that, despite the fact that she had stayed up all night and was high on ecstasy, she had to work at a daycare at 8:00 that morning. When they left, "a purple Neon" that the [Petitioner] had been driving was parked in a gravel lot behind the apartment building. Tammy Compton, the victim's downstairs neighbor, testified that she got up around 3:00 a.m. on July 1, 2005, to let her dog out. Ms. Compton saw three cars parked in the back lot, including "a purple car." The same three cars were in the back parking lot when Ms. Compton got up at 5:30 that morning. Ms. Compton testified that when she left for work at 8:00 a.m., "only the purple car [was] there at that time."

Another of the victim's neighbors, Mr. Townsend, testified that he had been at the victim's apartment the night before but left around 2:00 a.m. because he had to work that morning. Mr. Townsend testified that he was running late that morning and got to work around 7:30 a.m. When he left for work that morning, Mr. Townsend "noticed the [Petitioner]'s car was still parked in the back" lot. Mr. Townsend testified that he forgot his lunch that morning so he went back to his apartment around 9:00 a.m.

6

According to Mr. Townsend, the [Petitioner]'s car was no longer in the back lot, but parked in front of the victim's apartment.

Mr. Anderson testified that he had met the victim through the [Petitioner] and that the party at the victim's apartment on June 30, 2005, was for him. Mr. Anderson explained that he was about to move to Kentucky because he was "ready to go" and that he had been living in Clarksville under an assumed name because he "was on the run" from a "drug charge in Alabama." Mr. Anderson testified that the [Petitioner] had been helping him pack and that sometime between midnight and 1:00 a.m., the [Petitioner] drove him to the victim's apartment in a purple Neon. The victim's cousin, Mr. Phillips, took Mr. Anderson home sometime between 4:00 and 5:00 a.m. Mr. Anderson explained that he left the party "early" because he had to be in court over a traffic ticket at 8:00 a.m. Mr. Anderson's brother-in-law, Eddie Holliness, picked him up around 7:30 a.m. and took him to the municipal court. After court, the two men then went to a "junk yard" to look for a transmission. Mr. Anderson testified that while he was at the "junk yard," he spoke with the [Petitioner] on a cell phone and told the [Petitioner] to stay at his house until he got back so the [Petitioner] could help him with some more packing. The [Petitioner] was not at Mr. Anderson's house when Mr. Anderson and Mr. Holliness returned around 11:00 a.m.

At trial, several witnesses, including Mr. Townsend and Mr. Anderson, testified that the [Petitioner] did not have a job, usually did not have any money, was essentially living in the victim's apartment because he could not afford to stay anywhere else, and "like[d] to use" cocaine. Mr. Townsend and Mr. Anderson both testified that they never saw the [Petitioner] pay for anything except for gasoline. However, on July 1, 2005, the [Petitioner] met with his ex-girlfriend, Sharmar Graham, to take her and her children shopping to get "some book bags and some school clothes." Ms. Graham testified that the [Petitioner] bought her some shoes that day as well, but she could not remember if the [Petitioner] bought any clothes for himself. Ms. Graham further testified that she met the [Petitioner] around 11:30 a.m. that day and estimated that the [Petitioner] spent around $200. Ms. Graham also testified that despite the fact that the [Petitioner] did not have a job or his own place to live, he had purchased things in the past for her and her children. Mr. Anderson testified that later that night, the [Petitioner] came to his house to help pack. According to Mr. Anderson, the [Petitioner] looked "clean" and was wearing "new clothes and new shoes."

7

Mr. Anderson testified that sometime during the afternoon on July 1, 2005, he learned that the victim had been murdered. According to Mr. Anderson, when the [Petitioner] came over to his house that night the [Petitioner] did not seem upset and did not say anything about the victim's death. Likewise, Mr. Cantrell testified that he used to speak to the [Petitioner] everyday, but he did not see the [Petitioner] for almost two days after the victim's death. Mr. Cantrell recalled that the [Petitioner] did not go to the victim's funeral and did not "show any emotion over" the victim's death. However, Ms. Graham testified that she was with the [Petitioner] when he learned of the victim's death and that the [Petitioner] became "upset" and cried.

Mr. Anderson testified that about an hour after the [Petitioner] arrived at his house on the evening of July 1, 2005, police officers arrived and took the [Petitioner], Mr. Anderson, and his wife, Latricia Holliness, to the police station for questioning regarding the victim's murder. Mr. Anderson testified that he did not give the police officers his real name but that he did tell them what he knew about the victim's death. Ms. Holliness testified that at one point, she was alone in a room with the [Petitioner] when the [Petitioner] gave her the keys to the purple Neon and "mentioned" something about a gun. Ms. Holliness stated that she gave the keys to her husband. Det. Crowe testified that he administered a gunshot residue (GSR) test on the [Petitioner]'s hands that night. According to Det. Crowe, the [Petitioner] became "very nervous" when told about the GSR test. The [Petitioner] told Det. Crowe that "he had fired off fireworks that day." Det. Crowe lied to the [Petitioner] and told him that the GSR test could distinguish between handling fireworks and shooting a gun. When told this, the [Petitioner] "recanted the first statement," said that he had "been shooting guns too," and then said that he shot targets "a lot." Det. Crowe testified that the [Petitioner] "became very nervous and was very upset" about the GSR test.

Dr. Staci Turner, an expert in forensic pathology, . . . performed an autopsy on the victim on July 2, 2005 [and] . . . concluded that the cause of death was a gunshot wound to the head. . . . Dr. Turner also testified that there was no soot or stippling present on the victim's body which lead her to conclude that "the gun was fired roughly greater than three feet away from the head." Dr. Turner was unable to determine a time of death for the victim. The police investigation ultimately revealed that the bullet that

killed the victim had been fired from a Hi-Point Firearms .380 caliber handgun.

Several witnesses testified that they had seen the [Petitioner] with a .380 caliber handgun both before and after the victim's murder. Mr. Cantrell testified that the [Petitioner] "owned" a .380 caliber handgun and that he had seen the gun at the victim's apartment prior to the murder. Mr. Cantrell also testified that both the [Petitioner] and the victim handled the gun and that the gun never left the victim's apartment. Mr. Cantrell further testified that the victim had showed him a "pinch mark" where the gun had pinched the victim's hand. Mr. Cantrell testified that he assumed the pinch had come from a "crack in the handle," but he never actually saw a crack on the gun. Mr. Kizer also testified that the victim and the [Petitioner] owned "a little black pistol" with "a silver strip like at the top."

. . . .

On December 27, 2005, Officer James Kelly Crow of the Cumberland City Police Department recovered "a Hi-Point .380 caliber handgun" from an individual named Karl Banks during a traffic stop. Special Agent Steve Scott of the Tennessee Bureau of Investigation (TBI), an expert witness in the area of firearms identification and ballistics, testified that the handgun recovered from Mr. Banks was the same handgun that had been used to kill the victim. Mr. Cantrell testified at trial that the gun recovered from Mr. Banks was a "[t]win" of the gun he had previously seen the [Petitioner] with. Likewise, Mr. Phillips testified that the gun recovered from Mr. Banks was "the exact same gun" he had seen the [Petitioner] with at the victim's apartment. Mr. Kizer also testified that the gun recovered from Mr. Banks "look[ed] like" the [Petitioner]'s gun.

The gun was registered to Derrick Isaiah Poe, a Staff Sergeant in the United States Army who was stationed at Fort Campbell in 2005. Mr. Poe testified that in 2005 he owned a black .380 caliber Hi-Point handgun that he had not seen since the Spring of 2005. According to Mr. Poe, in April 2005, he went to "Kickers' Club" with the [Petitioner]. Mr. Poe testified that he knew the [Petitioner] through a "mutual friend." Mr. Poe testified that he was intoxicated that night and the [Petitioner] drove him to the club. According to Mr. Poe, he "left the gun in the trunk of [the Petitioner's] car." When they arrived at the club, Mr. Poe met with Mr. Anderson and the two men went inside. The [Petitioner] was unable to get into the club that night. Mr. Poe testified that he "ended up leaving the club early with a

9

female" and realized the next day that he had left his gun in the [Petitioner's] car. Mr. Poe further testified that he tried to get in touch with the [Petitioner] but he was unable to do so. Mr. Poe reported that his gun was stolen on May 1, 2005. Mr. Poe stated in the report that he believed the [Petitioner] had stolen his gun. Mr. Poe admitted at trial that he lied in the police report when he stated that his gun had been stolen from his apartment after a party. Mr. Poe explained that he lied to the police because he was "scared" and believed that it was illegal to "ride around . . . with a gun in the car." Mr. Poe testified that he had not seen his gun since the night he went to the "Kickers' Club" with the [Petitioner] and Mr. Anderson.

Jamar Christian Ashe, a convicted drug dealer, testified that he had met the [Petitioner] "two times" while selling cocaine. Mr. Ashe testified that the second time he met the [Petitioner] at an apartment complex and the [Petitioner] offered to sell him "a pistol." According to Mr. Ashe, the [Petitioner] told him the gun was "straight," and Mr. Ashe offered to give the [Petitioner] "two grams of powder for it." Mr. Ashe recalled that "the whole bottom piece" of the gun was black and that "the top piece that you pull back, that was like grayish color." Mr. Ashe testified that in November 2005, he gave the gun he purchased from the [Petitioner] to Mr. Banks. According to Mr. Ashe, he received a phone call from Mr. Banks and learned that Mr. Banks had been "jumped" by several men at a local club. Mr. Ashe testified that he met with Mr. Banks that night and gave the [Petitioner]'s gun to Mr. Banks. Mr. Ashe claimed that he did not know anything about the victim's murder when he bought the gun from the [Petitioner] and when he gave the gun to Mr. Banks.

At trial, Mr. Ashe admitted that he had lied to the police and told them several different versions of how Mr. Banks got the [Petitioner]'s gun. Mr. Ashe admitted that he had first told the police that Mr. Banks had bought the gun directly from the [Petitioner]. Mr. Ashe claimed that Mr. Banks had told him this during a phone conversation. Mr. Ashe then told the police that he met with the [Petitioner] and set the [Petitioner] up with Mr. Banks after the [Petitioner] asked him if he knew of anyone that needed a gun. Mr. Ashe also admitted that he lied to the police and told them that he had never touched the gun. Mr. Ashe eventually told the police that he had stolen the gun from the [Petitioner]'s car. Mr. Ashe testified that he just wanted "to tell [the jury] the whole truth" and that his testimony about buying the gun from the [Petitioner] was truthful.

10

Mr. Banks testified that he was arrested on December 27, 2005, and that the gun he had received from Mr. Ashe was in the car that day. Mr. Banks admitted that when he was arrested he lied to the police and told them that he had gotten the gun "from a smoker[,] . . . a white guy." Ashley Plant testified that she was with Mr. Banks when he received the gun from Mr. Ashe. Ms. Plant testified that in November 2005, Mr. Banks had gotten "into a fight with a dude" at the Starlight Lounge. Mr. Banks called Mr. Ashe to get a gun because he had been hit "in the face with a gun." Ms. Plant testified that Mr. Ashe got into the car with her and Mr. Banks and then gave Mr. Banks a gun. However, Mr. Ashe testified that Ms. Plant was not present when he gave Mr. Banks the gun and that Ms. Plant "didn't know about the gun."

The [Petitioner] did not testify at trial. However, the [Petitioner] gave several statements to the police that were introduced into evidence at trial. The [Petitioner] first told police that he was in and out of the victim's apartment throughout the night of June 30, 2005, and the early morning hours of July 1, 2005. The [Petitioner] claimed that he took Mr. Anderson home from the victim's apartment around 4:30 a.m. The [Petitioner] also claimed that he left the victim's apartment between 7:30 and 8:00 a.m. The [Petitioner] further claimed that he took Mr. Anderson to court at 10:00 a.m. The [Petitioner] then claimed that he did not leave his house until around 1:30 p.m. when he went "school shopping" with Ms. Graham. In a later statement, the [Petitioner] again claimed to have been in and out of the victim's apartment all night. However, the [Petitioner] claimed that he took Mr. Anderson to a gas station "to catch a ride" at 4:30 a.m. The [Petitioner] again claimed to have left the victim's apartment at 7:30 a.m., but did not claim to have taken Mr. Anderson to court that morning. The [Petitioner] also claimed not to have left his house until 1:30 p.m. when he went shopping with Ms. Graham.

The [Petitioner] denied killing the victim or knowing "who killed" the victim. The [Petitioner] also denied that he was so "high" that night that he could not remember what happened. The [Petitioner] denied owning or possessing "a gun in the last thirty days." However, the [Petitioner] stated that the GSR test performed on him would "probably show up positive because [he] had shot a gun probably a day or two before that when [he] went to the country for the 4th of July." The [Petitioner] further stated that the gun he had shot belonged to him. The [Petitioner] described the gun as a "black gun" and stated that the last place he had seen the gun was at the victim's apartment. The [Petitioner] admitted that he

11

had given his car keys to Ms. Holliness while they were at the police station, but he denied that he asked her "to take a gun out" of his car. The [Petitioner] stated that he was wearing blue sweat shorts and a "gray or blue long shirt" on the day the victim was killed. The [Petitioner] admitted that the police had confiscated a pair of his shoes, which had blood on them. However, the [Petitioner] stated that the blood did not belong to the victim. Instead, the [Petitioner] stated that it belonged to "[s]omeone [he] got into a fight with."

. . . .

In addition to this evidence, several witnesses testified about the relationship between the [Petitioner] and the victim. Mr. Cantrell testified that the two men had a "real good" relationship and that the [Petitioner] was at the victim's apartment "everyday." Likewise, Mr. Kizer testified that the two men were friends and that the [Petitioner] was at the victim's apartment every time Mr. Kizer visited the victim. Mr. Phillips also testified that the [Petitioner] and the victim were friends. Mr. Townsend testified that the [Petitioner] and the victim were "good friends" and that he saw the [Petitioner] at the victim's apartment "[a]lmost everyday."

*Maurice O. Byrd*, 2012 WL 5989817, at *1-8.

## A. July 17, 2014 Hearing

Counsel testified that he represented the Petitioner at trial. Following the trial, Counsel learned that the Petitioner planned to retain someone else. Counsel agreed that there were issues that arose during the trial that, had he remained on the case, he would have pursued in a motion for new trial.

Counsel testified that, in his opinion, it was important to Shepardize cases in order to know whether the law had been overturned or modified. He confirmed that attorneys are not to cite as precedent case law that has been overturned. Counsel further agreed that he had an "ethical obligation" to address, upon learning of it, a "blatant obvious and fatal defect" in an appellate brief. Counsel opined that it would be a "dangerous proposition for [a] client" if an attorney became aware of overturned case law relied upon in a brief, and the attorney did not address it.

Sandra McQueen, the Petitioner's mother, testified that after the Petitioner was convicted at trial, she spoke with several attorneys in Clarksville, Tennessee, before hiring Appellate Counsel to represent the Petitioner. It was Ms. McQueen's

understanding that Appellate Counsel was going to file an appeal on the Petitioner's behalf. Ms. McQueen said that she requested a contract but that Appellate Counsel said "just pay [me] the money to start the appeal." Ms. McQueen confirmed that Appellate Counsel had also agreed to handle a post-conviction claim. Appellate Counsel told Ms. McQueen that another attorney would be "help[ing]" Appellate Counsel with the Petitioner's case, but Ms. McQueen never met this other attorney. Ms. McQueen testified that she paid Appellate Counsel between $5,000 and $7,000 for representation.

Ms. McQueen testified that Appellate Counsel never provided her with a copy of the appellate brief nor did Appellate Counsel notify Ms. McQueen when the Court of Criminal Appeals issued its decision in the direct appeal. Ms. McQueen said that she called Appellate Counsel's office "a bunch of times" and ultimately was referred to a "website" to check for the status of the case. Ms. McQueen recalled that Appellate Counsel never filed an application for permission to appeal to the Tennessee Supreme Court for the direct appeal or a post-conviction petition. Ms. McQueen testified that she never instructed Appellate Counsel not to file an application with the supreme court.

The Petitioner testified that his only encounter with Appellate Counsel was at court when she told him she was his new lawyer. The Petitioner wrote letters to Appellate Counsel about his appeal, but Appellate Counsel never responded. The Petitioner stated that he was never told that there might be another attorney working on his appeal. The Petitioner confirmed that he received the Court of Criminal Appeals opinion in the mail but that Appellate Counsel never contacted him or asked whether he wanted to pursue an appeal to the supreme court. When asked if he wanted to pursue supreme court review, the Petitioner responded, "if it would help me."

The Petitioner testified that he was unaware of any post-conviction paperwork filed by Appellate Counsel. The Petitioner said that Appellate Counsel never advised him that the post-conviction attorney might have to address issues involving the appellate attorney's representation.

Appellate Counsel testified that she was retained after the trial but before the motion for new trial. She said that normally she would file a "marker motion," order the trial transcripts and, after review of the transcripts, amend the motion. She had no recollection of whether she did this in the Petitioner's case.[2] Appellate Counsel stated that it was her understanding about her representation of the Petitioner that she was to

---

[2] The direct appeal record in this case indicates that Appellate Counsel filed a motion for new trial asserting insufficiency of the evidence and ineffective counsel. She further reserved the right to amend the motion following review of the trial transcript. An amended motion was filed on October 28, 2010, that was essentially the same motion with the issue of ineffective assistance of counsel claim removed.

"either pursue an appeal or we also discussed the possibility of going ahead and pursuing a petition for post-conviction based on the trial."

Appellate Counsel testified that, at the time she accepted this case, she began practicing law with Mr. Long and Mr. Herbison. She said that due to Mr. Herbison being "a great appellate lawyer" "the appeal was turned over to him." She said that she had sought Mr. Herbison's advice about the Petitioner's case, and Mr. Herbison advised that she should not pursue post-conviction "right away" but instead pursue a direct appeal. When asked about her interaction with the Petitioner, she said, "Just mailing him copies of everything basically." She confirmed that she never discussed the appeal with the Petitioner and then, at some point, the case was "turned over" to Mr. Herbison.

Appellate Counsel testified that she was unaware of what Mr. Herbison did with the case. She explained that in September 2011, the firm split with Mr. Long and Mr. Herbison forming a separate firm. Mr. Herbison took the Petitioner's client file with him. Appellate Counsel recalled that, at the time Mr. Herbison started his own firm, the Court of Criminal Appeals had not issued an opinion, so she was never notified when it was issued. Appellate Counsel said that when Ms. McQueen inquired at her office about the status of the case, she was directed to Mr. Herbison's office. Appellate Counsel agreed that she reviewed and signed the brief filed in this case and that the brief was filed in May 2011. Counsel agreed that it is important to cite to current law in a brief and also to read the appellee's brief. She further agreed that if a "glaring error" in the appellant's brief was pointed out by the appellee, as appellate counsel she would try to address that issue.

Appellate Counsel testified that she was unfamiliar with *State v. Dorantes*, 331 S.W.3d 370 (Tenn. 2011). She confirmed that she was unaware that the *Dorantes* case changed "the whole issue on sufficiency and guilt, direct versus circumstantial" evidence. Appellate Counsel stated that she would be surprised if the law relied upon in the Petitioner's brief was incorrect and pointed out by the State because "Mr. Herbison prepared all of that, and I don't believe I ever received the State's response brief." She stated that had she seen the State's brief identifying an error of that nature, she would have addressed it. Counsel conceded that such an error would "probably" provide a reasonable basis for finding ineffective assistance of appellate counsel.

After hearing the evidence, the post-conviction court took the matter under advisement and later issued an order:

The court believes that it is important to set forth a time line in this case:

1. July 1, 2005 homicide

2. Trial February 23, 2009; Crawford circumstantial evidence charged to the jury
3. Sentencing April 3, 2009
4. Motion for Transcripts April 3, 2009
5. Substitution of counsel April 16, 2009
6. Motion for New Trial April 27, 2009, alleging ineffective assistance of counsel at trial and insufficiency of the evidence.
7. Order for Transcripts May 21, 2009
8. Amended Motion for New Trial October 28, 2010, alleging insufficiency of the evidence and court to exercise duty as 13th juror.
9. Order denying Motion for New Trial October 28, 2010
10. State v. Dorantes filed January 25, 2011.
11. Record filed in Court of Criminal Appeals March 8, 2011.
12. Assigned on briefs on December 7, 2011
13. Opinion entered Court of Criminal Appeals on November 29, 2012.
14. Order granting delayed appeal August 23, 2013.
15. Application for permission to appeal to Supreme Court denied December 11, 2013.

On page 12 of the opinion Judge Thomas wrote:

"However, the State correctly notes that the [Petitioner]'s arguments are based entirely on legal precedents explicitly overruled by our supreme court in Dorantes.  The [Petitioner]'s assertion that because his conviction was based solely upon circumstantial evidence the State was required to rule out every reasonable hypothesis except that of guilt is simply no longer the law in Tennessee."

Judge Thomas did not address which law should have been applied - law at the time of the event/trial or law at the time of the appeal.

This court assumes based on the Court of Criminal Appeals opinion that no reply brief was filed.  The Court of Criminal Appeals did decide the case after Dorantes.  This court can not determine that the filing of a reply brief would have benefitted the Petitioner.  The Court of Criminal Appeals applied a more lenient standard, but it was the law.  There was nothing presented to this court that would make the court determine that any other result would have occurred.  No evidence was presented that there were other grounds to appeal.

15

The court has reviewed <u>Napoleon Momon vs. State of Tennessee</u>, 18 S.W.3rd (Tenn. 1999). The Petitioner has asserted that the harmless error criteria should not be used because this is a "structural defect in the constitution of the trial mechanism." ["]These errors have an impact upon 'the entire conduct of the trial from beginning to end.'" This court does not find that there has been any structural defects whatsoever.

The portion of the Post conviction Petition that pertains to the appeal in this case is denied. The remaining portions shall be set for hearing.

## B. March 30, 2015 Hearing

Sandra McQueen,[3] the Petitioner's mother, testified that she met with the Petitioner's appointed attorney, Counsel, twice. She said that she asked Counsel to contact three or four potential witnesses for the defense. On the day of trial, Counsel conveyed to Ms. McQueen that "he had a witness - - witnesses, but nobody showed up." After the trial, Ms. McQueen met and hired Appellate Counsel to handle the Petitioner's direct appeal and post-conviction claims. Ms. McQueen spoke with Appellate Counsel over the telephone because Ms. McQueen was living in Alabama. During Ms. McQueen's conversations with Appellate Counsel, Appellate Counsel never indicated that she had previously been appointed to the Petitioner's case and then recused due to a conflict.

Ms. McQueen testified that she was not familiar with and had never met an attorney named John Herbison. She confirmed that the only attorney she had contact with regarding the Petitioner's appeal was Appellate Counsel. Ms. McQueen recalled that Appellate Counsel indicated that another attorney would be helping her work on the case but that Appellate Counsel never provided the name of this attorney.

Counsel testified that, initially, another attorney had represented the Petitioner, but Counsel was appointed "early on" and handled the trial on the Petitioner's charges. Following the trial but before the filing of a motion for new trial, Appellate Counsel was retained. He estimated that Appellate Counsel was retained within forty-five days of the final day of trial. He did not recall whether he filed a motion for new trial but said that his "recollection" was that Appellate Counsel filed the motion for new trial. He agreed that, if he had filed anything, it would have been a "marker motion" to protect the Petitioner's reviewable issues. Counsel said that he and Appellate Counsel did not speak about the motion for new trial other than Appellate Counsel telling him in court that she had been hired to handle the motion for new trial and the appeal. Counsel confirmed that

---

[3] In the transcripts, Ms. McQueen's first name is spelled "Sandra" and "Sondra." We are unaware of which is the correct spelling and use the spelling from the prior hearing transcript for purposes of consistency.

neither Appellate Counsel nor anyone from her office ever contacted him seeking information about the case.

Counsel testified about his preparation for the trial. He recalled that there was an inmate who was allegedly talking about "some involvement" in the victim's murder. Counsel obtained several continuances to attempt to further investigate but "[n]othing panned out from that information." Counsel testified that he met with the Petitioner between four and eight or nine times. Counsel did not recall having subpoenaed witnesses to trial who failed to appear; however, he noted that there were witnesses he elected not to call at trial for reasons related to trial strategy.

On cross-examination, Counsel testified that the trial was in 2009; thus, the law charged to the jury about circumstantial evidence was *State v. Crawford*, 470 S.W.2d 610, 612 (Tenn. 1971). He agreed that the *Dorantes* opinion was issued in 2011, and the Petitioner's position would not have been improved under the *Dorantes* standard for circumstantial evidence. 331 S.W.3d 370 (Tenn. 2011).

Counsel testified that he believed the trial to be "clean" although there "may have been an evidentiary issue or two" that he would have raised on appeal. About witnesses, Counsel said that he discussed with the Petitioner the strengths and weaknesses of various witnesses that the State would not be calling at trial. Ultimately, the Petitioner decided whether to call those witnesses, and Counsel believed the Petitioner's decisions with regard to the witnesses were in his best interest. Counsel stated that, had Appellate Counsel contacted him, he believed that he could have provided her with some helpful insight into potential appealable issues.

The Petitioner testified that he met with Counsel two but no more than three times prior to trial. The Petitioner was housed in the Montgomery County jail where he and Counsel met on those occasions. The Petitioner confirmed that he had provided Counsel with the names of "a couple" people to interview. The Petitioner did not know whether Counsel spoke with the people he had identified as potential witnesses. The Petitioner was aware that Counsel had employed an investigator, but the Petitioner never spoke with the investigator.

The Petitioner testified that he had questions he had wanted Counsel to ask various witnesses at trial and that Counsel did not ask those questions. The Petitioner testified that he was unaware of whether there were any witnesses at trial to testify on his behalf. He stated that he did not "see anybody." He said that he expected "Shamar Graham" and "Maxine Stinson" to testify on his behalf. The Petitioner asserted that Shamar Graham could have impeached state witness, Freddie Anderson. Maxine Stinson could have

17

testified that the Petitioner was staying at her home and about the time he arrived and left her home the day of the murder.

The Petitioner testified that he never met with Appellate Counsel or anyone from her law office. The Petitioner recalled being present at a hearing during which Appellate Counsel "questioned" "somebody [who] came from out-of-state." When making the decision to hire Appellate Counsel, the Petitioner's mother communicated with Appellate Counsel. After Appellate Counsel was hired, the Petitioner sent Appellate Counsel six or seven letters. In response, the Petitioner received notices of court dates but no response to his letters. The Petitioner confirmed that he had various issues he wanted to speak with Appellate Counsel related to his appeal. The Petitioner confirmed that he was asking the court to grant him a new trial or, in the alternative, "go back to the new trial motion."

On cross-examination, the Petitioner agreed that the State investigated the information from the inmate alleging that another inmate was involved in the murder and was unable to substantiate the information. The Petitioner agreed that Counsel elicited a confession from one of the State's witnesses that he had lied and that the witness had testified at trial in hopes the State would dismiss his charges. About Ms. Stinson's testimony, the Petitioner agreed that Ms. Stinson would have testified that the Petitioner returned to her home at 8:00 or 9:00 a.m. and the victim was killed at around 6:00 a.m. The Petitioner further agreed that Ms. Graham, his girlfriend, would have testified that the Petitioner had been "broke," was unemployed, and "showed up with cash" on the day of the victim's murder to take her shopping. The Petitioner denied that Counsel spoke with him about the possibility of calling Ms. Graham as a witness.

The Petitioner testified that in his letters to Appellate Counsel he provided information that Appellate Counsel had asked him for. He agreed that there was "[p]robably not" a need for Appellate Counsel to respond since he was providing information at her request.

After hearing the evidence, the post-conviction court denied the Petitioner relief. It is from this judgment that the Petitioner now appeals.

## II. Analysis

On appeal, the Petitioner maintains his claim[4] that Appellate Counsel's representation was ineffective. He contends that Appellate Counsel's errors amounted to a constitutional structural defect that entitles him to a renewed motion for a new trial and

---

[4] In the Petitioner's brief, he makes no argument as to his post-conviction petition allegations against trial counsel, maintaining only those claims that pertain to Appellate Counsel.

direct appeal. The State responds that the Petitioner has not met his burden of showing that any alleged deficiency led to his conviction. We agree with the State.

In order to obtain post-conviction relief, a petitioner must show that his or her conviction or sentence is void or voidable because of the abridgment of a constitutional right. T.C.A. § 40-30-103 (2014). The petitioner bears the burden of proving factual allegations in the petition for post-conviction relief by clear and convincing evidence. T.C.A. § 40-30-110(f) (2014). Upon review, this Court will not re-weigh or re-evaluate the evidence below; all questions concerning the credibility of witnesses, the weight and value to be given their testimony, and the factual issues raised by the evidence are to be resolved by the trial judge, not the appellate courts. *Momon v. State*, 18 S.W.3d 152, 156 (Tenn. 1999) (citing *Henley v. State*, 960 S.W.2d 572, 578-79 (Tenn. 1997)). A post-conviction court's factual findings are subject to a de novo review by this Court; however, we must accord these factual findings a presumption of correctness, which can be overcome only when a preponderance of the evidence is contrary to the post-conviction court's factual findings. *Fields v. State*, 40 S.W.3d 450, 456-57 (Tenn. 2001). A post-conviction court's conclusions of law are subject to a purely de novo review by this Court, with no presumption of correctness. *Id*. at 457.

The right of a criminally accused to representation is guaranteed by both the Sixth Amendment to the United States Constitution and article I, section 9 of the Tennessee Constitution. *State v. White*, 114 S.W.3d 469, 475 (Tenn. 2003); *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999); *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975). The following two-prong test directs a court's evaluation of a claim for ineffectiveness:

> First, the [petitioner] must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the [petitioner] by the Sixth Amendment. Second, the [petitioner] must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the [petitioner] of a fair trial, a trial whose result is reliable. Unless a [petitioner] makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see also State v. Melson*, 772 S.W.2d 417, 419 (Tenn. 1989).

In reviewing a claim of ineffective assistance of counsel, this Court must determine whether the advice given or services rendered by the attorney are within the range of competence demanded of attorneys in criminal cases. *Baxter*, 523 S.W.2d at

19

936. To prevail on a claim of ineffective assistance of counsel, "a petitioner must show that counsel's representation fell below an objective standard of reasonableness." *House v. State*, 44 S.W.3d 508, 515 (Tenn. 2001) (citing *Goad v. State*, 938 S.W.2d 363, 369 (Tenn. 1996)).

When evaluating an ineffective assistance of counsel claim, the reviewing court should judge the attorney's performance within the context of the case as a whole, taking into account all relevant circumstances. *Strickland*, 466 U.S. at 690; *State v. Mitchell*, 753 S.W.2d 148, 149 (Tenn. Crim. App. 1988). The reviewing court should avoid the "distorting effects of hindsight" and "judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Strickland*, 466 U.S. at 689-90. In doing so, the reviewing court must be highly deferential and "should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Burns*, 6 S.W.3d at 462. Finally, we note that a defendant in a criminal case is not entitled to perfect representation, only constitutionally adequate representation. *Denton v. State*, 945 S.W.2d 793, 796 (Tenn. Crim. App. 1996). In other words, "in considering claims of ineffective assistance of counsel, 'we address not what is prudent or appropriate, but only what is constitutionally compelled.'" *Burger v. Kemp*, 483 U.S. 776, 794 (1987) (quoting *United States v. Cronic*, 466 U.S. 648, 665 n.38 (1984)). Counsel should not be deemed to have been ineffective merely because a different procedure or strategy might have produced a different result. *Williams v. State*, 599 S.W.2d 276, 279-80 (Tenn. Crim. App. 1980). "'The fact that a particular strategy or tactic failed or hurt the defense, does not, standing alone, establish unreasonable representation. However, deference to matters of strategy and tactical choices applies only if the choices are informed ones based upon adequate preparation.'" *House*, 44 S.W.3d at 515 (quoting *Goad*, 938 S.W.2d at 369).

If the petitioner shows that counsel's representation fell below a reasonable standard, then the petitioner must satisfy the prejudice prong of the *Strickland* test by demonstrating "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694; *Nichols v. State*, 90 S.W.3d 576, 587 (Tenn. 2002). This reasonable probability must be "sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694; *Harris v. State*, 875 S.W.2d 662, 665 (Tenn. 1994).

The evidence does not preponderate against the post-conviction court's findings. Appellate Counsel filed a marker motion, amended the motion to preserve the issue of ineffective assistance of counsel for post-conviction review, and argued the motion for new trial which was denied. Appellate Counsel filed a brief asserting insufficiency of the evidence based on law no longer in effect, and this Court affirmed the trial court. Appellate Counsel explained that, at the time this Court's opinion was issued, she had

20

separated from her firm and the attorney then handling the Petitioner's appeal was notified of the appeal rather than her; thus, she could not advise Petitioner of his right to seek supreme court review. A delayed appeal was granted, however, allowing the Petitioner to file a Rule 11 application to our supreme court which was denied on December 11, 2013.

The Petitioner correctly identifies deficiencies with Appellate Counsel's performance; however, he has failed to show prejudice. Appellate Counsel relied on old law about circumstantial evidence rather than current law even after the State identified this error in the brief. Nonetheless, the Petitioner does not show that, even had Appellate Counsel filed a reply brief arguing under the new *Dorantes* standard, the outcome would have been different. Further, as the post-conviction court noted, although the Petitioner complains of Appellate Counsel's singular issue on appeal based upon inapplicable law, he fails to assert what appealable issues were present that Appellate Counsel failed to pursue. As to Appellate Counsel's failure to file an application for supreme court review, the Petitioner cannot prove he was prejudiced because this issue was remedied by the grant of a delayed appeal.

To the extent that the Petitioner argues that Appellate Counsel's deficiencies amounted to a structural defect, we conclude that the deficiencies did not rise to the level of structural defect constituting a complete denial of counsel. *See Wallace v. State*, 121 S.W.3d 652, 658-59 (Tenn. 2003)

Accordingly, the Petitioner has not shown that he is entitled to relief under the *Strickland* standard. Therefore, the post-conviction court properly denied relief.

### III. Conclusion

In accordance with the foregoing reasoning and authorities, we affirm the post-conviction court's judgment.

_____
ROBERT W. WEDEMEYER, JUDGE